# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Larry Hayes,**
**Petitioner Below, Petitioner**

**FILED**

September 11, 2015
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

**vs)   No. 14-0915** (Kanawha County l4-P-163)

**Marvin C. Plumley, Warden, Huttonsville**
**Correctional Center, Respondent Below,**
**Respondent**

## MEMORANDUM DECISION

Petitioner Larry Hayes, appearing *pro se*, appeals the order of the Circuit Court of Kanawha County, entered August 22, 2014, denying his petition for writ of habeas corpus. Respondent Marvin C. Plumley, Warden, Huttonsville Correctional Center, by counsel Laura Young, filed a response, and petitioner filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On September 30, 2010, petitioner had sole care of his girlfriend's daughter, eighteen-month-old B.M., while his girlfriend was at work. As petitioner drove to pick up his girlfriend from work, he called her and said, "Something is wrong with B.M." When petitioner arrived at his girlfriend's workplace, the girlfriend pulled B.M. out of her car seat. Blood was coming from B.M.'s nose and mouth, and she was not breathing. Petitioner's girlfriend began CPR. Firemen arrived and took B.M. to the hospital where she was resuscitated and placed on a ventilator. When it was determined that B.M. had no brain activity, her mother removed B.M. from the ventilator. B.M. died shortly thereafter, on October 3, 2010.

Petitioner was indicted in January of 2011 on one count of the death of a child by a parent, guardian, or custodian by abuse in violation of West Virginia Code § 61-8D-2a(a), which provides as follows:

> If any parent, guardian or custodian shall maliciously and intentionally inflict upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical condition by other than accidental means, thereby causing the death of such child, then such parent, guardian or custodian shall be

1

guilty of a felony.

The indictment tracked the language of West Virginia Code § 61-8D-2a(a) in that it charged petitioner with "unlawfully, feloniously, maliciously[,] and inflict[ing] upon [B.M.[1]], substantial physical pain, illness[,] and impairment of physical condition by other than accidental means, and . . . thereby caus[ing] the death of [B.M], in violation [West Virginia Code § 61-8D-2a(a)], against the peace and dignity of the State."

Petitioner's trial was held in August of 2011. The jury found petitioner guilty of the death of a child by a parent, guardian, or custodian by abuse in violation of West Virginia Code § 61-8D-2a(a). The circuit court sentenced petitioner to a determinate term of forty years in prison, followed by a ten-year term of supervised release. Petitioner appealed his conviction to this Court, resulting in the issuance of a memorandum decision in *State v. Hayes*, No. 11-1641, 2013 WL 2149870 (W.Va. Supreme Court, May 17, 2013). In his appeal, petitioner made the following assignments of error: (1) the trial court denied petitioner the right to compulsory process when it refused to enforce petitioner's subpoena of Dr. Allen Mock, West Virginia's deputy chief medical examiner;[2] and (2) the circuit court violated petitioner's due process right to present a complete defense when it refused to allow his expert, Dr. Thomas Young, to give his opinion regarding Dr. Mock's testimony and thereby indirectly impeach that testimony. *Id.* at *3-4. This Court rejected petitioner's arguments and affirmed his conviction. *Id.* at *3-5.

On April 2, 2014, petitioner filed a petition for writ of habeas corpus raising two grounds of relief. First, petitioner alleged that trial counsel provided ineffective assistance by (a) failing to have a statement petitioner made to the police suppressed; (b) failing to meaningfully cross-examine Dr. Mock; (c) failing to correctly argue a post-trial motion for judgment of acquittal based on insufficiency of evidence. Second, petitioner alleged that appellate counsel failed to raise unspecified issues on direct appeal in *Hayes*. After requiring a response by respondent warden, the circuit court entered a nineteen page order on August 22, 2014, denying the petition.

Petitioner now appeals to this Court. We apply the following standard of review in habeas cases:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 418, 633 S.E.2d 771, 772 (2006).

---

[1] Only the initials of the minor victim are used pursuant to Rule 40(e)(1) of the West Virginia Rules of Appellate Procedure.

[2] Dr. Mock, who has since become the chief medical examiner, testified as part of the State's case-in-chief and then was cross-examined by petitioner's counsel.

On appeal, petitioner raises the following issues: (1) the indictment was deficient; (2) trial counsel was ineffective because counsel failed to (a) have a statement petitioner made to the police suppressed; (b) meaningfully cross-examine Dr. Mock due to a lack of an adequate investigation; and (c) correctly argue a post-trial motion for judgment of acquittal based on insufficiency of evidence; (3) appellate counsel was ineffective because of a failure to raise (a) the deficiency of the indictment, and (b) ineffective assistance of trial counsel; and (4) the circuit court erred in denying petitioner's petition without holding a hearing, appointing counsel, and authorizing an investigator and a medical expert. Respondent warden counters that the circuit court adequately rejected the claims raised by petitioner in his habeas petition in a well-reasoned order, and that the issues petitioner raised only on appeal lack merit.

We agree with respondent warden and find that the circuit court's order adequately rejected those claims raised in the habeas petition; therefore, we address only those errors petitioner first alleged on appeal: (1) the allegedly deficient indictment; (2) appellate counsel's alleged failure to raise (a) the claim regarding the indictment, and (b) ineffective assistance of trial counsel; and (3) the circuit court's alleged error in denying petitioner's petition without holding a hearing, appointing counsel, etc. We reject petitioner's claim that the indictment was deficient. Based on our review of the indictment, we find that it closely tracks the language of West Virginia Code § 61-8D-2a(a)—the statute under which petitioner was charged—and was, therefore, proper. *See* Syl. Pt. 3, *Pyles v. Boles*, 148 W. Va. 465, 135 S.E.2d 692, 694 (1964).

Second, regarding the performance of appellate counsel, we note that counsel had no obligation to raise meritless claims. In this case, petitioner's claim regarding the indictment lacked merit. As explained in the circuit court's order, petitioner's claim that trial counsel was ineffective also lacked merit and, therefore, the same would not have been addressed in petitioner's direct appeal even if it was raised. *See* Syl. Pt. 10, *State v. Triplett*, 187 W.Va. 760, 762-63, 421 S.E.2d 511, 513-14 (1992) (rarely do we address ineffective assistance claims on direct appeal). Accordingly, petitioner's claim regarding his appellate counsel's performance is also without merit.

Finally, petitioner argues that the circuit court had a duty to provide whatever facilities and procedures were necessary to afford petitioner an adequate opportunity to demonstrate his entitlement to habeas relief. Respondent warden counters that in Syllabus Point 1 of *Perdue v. Coiner*, 156 W.Va. 467, 194 S.E.2d 657, 658 (1973), we held as follows:

> A court having jurisdiction over habeas corpus proceedings may deny a petition for a writ of habeas corpus without a hearing and without appointing counsel for the petitioner if the petition, exhibits, affidavits or other documentary evidence filed therewith show to such court's satisfaction that the petitioner is entitled to no relief.

As reflected by Syllabus Point 10 of *Triplett*, a habeas proceeding is the proper forum for litigating claims alleging ineffective assistance of counsel; however, such claims need to be litigated only when they have merit. In this case, we find that the circuit court correctly determined that

3

petitioner's ineffective assistance claims have no merit for reasons given in its order.[3]  Therefore, we determine that the circuit court properly denied the habeas petition without holding a hearing or granting petitioner's other requests pursuant to Syllabus Point 1 of *Perdue*.

As to the issues raised in the instant petition, we have reviewed the circuit court's "Order Denying Petitioner's Petition for Habeas Corpus," entered on August 22, 2014, and hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions.[4]  The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

For the foregoing reasons, we find no error in the decision of the Circuit Court of Kanawha County and affirm its August 22, 2014, order denying petitioner's petition for writ of habeas corpus.

Affirmed.

**ISSUED:**  September 10, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum
Justice Allen H. Loughry II

---

[3] For example, while petitioner contends that trial counsel failed to meaningfully cross-examine Dr. Mock, we noted in *Hayes* that counsel's cross-examination lasted "an hour and a half" and covered "various issues." 2013 WL 2149870, at *3.

[4] Certain names have been redacted. *See* fn. 1, *supra*.

4

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**FILED**

2014 AUG 22 AM 11: 39

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

**LARRY HAYES**

    **Petitioner**

v.

    14-P-163
    Judge Paul Zakaib, Jr.

**MARVIN C. PLUMLEY, WARDEN,
HUTTONSVILLE CORRECTIONAL CENTER,**

    **Respondent.**

## ORDER DENYING PETITIONER'S PETITION FOR
## WRIT OF HABEAS CORPUS

On a previous date, came Larry Hayes, (Petitioner), pro se, and came the Respondent, by counsel, Jennifer D. Gordon, Assistant Special Prosecuting Attorney in and for Kanawha County, West Virginia and Counsel for the Respondent, filed a response to the Petition for Writ of Habeas Corpus previously filed by Petitioner. After reviewing arguments of Petitioner and counsel and a thorough review of the Petition for Writ of Habeas Corpus and accompanying memorandum, the Respondent's Response, exhibits, and other documentary evidence and applicable case law, the Court **FINDS** the matters ripe for decision and makes the following Findings of Fact and Conclusions of Law:

### I.    FINDINGS OF FACT

1. R███████ M███████ was only eighteen months old when she died. *See* Tr. Aug. 24, 2011 trial at pp. 62-63. She was the daughter of M█████ B██ and T.J. M███████ *Id.* R████ s family referred to her as "B███" *Id.* at 61.

2. At the time of B███ s death, M█████ was dating the Petitioner. They lived together in South Charleston. *Id.* at 62-63.





3. M█████ testified that when B████ hurt herself, she referred to it as a "boo boo." She would point to her "boo boo" and ask her mom to kiss it or put a band-aid on it. *Id.* at 66.

4. Petitioner watched B████ while M█████ worked as a waitress at IHOP. B████ would also stay with her paternal grandparents on the weekends. *Id.*

5. M█████ was working at IHOP in South Charleston on September 30, 2010. Petitioner drove her to work. B████ was in the car with him. They dropped her off at 8:00 a.m. *Id.* at 67. When M█████ last saw her daughter that morning, she was strapped in her car seat. She waived bye to her mom and was happy. There were no stains on B████'s car seat straps. *Id.* at 68. Petitioner was the only one with B████ for the entire day of September 30, 2010. *Id.* at 72.

6. M█████ was scheduled to get off work around 1:30 or 2:00 p.m. that day. Throughout the morning, Petitioner never gave M█████ any indication that B████ wasn't feeling well. It was only when Petitioner called M█████ as he was pulled into the IHOP parking lot that he told her that something was wrong with B████ *Id.* at 72. Lamar Mosely, a co-worker of M█████'s, called 911. *Id.* at 73.

7. B████ was wearing a red shirt and overalls with cherries on them. *Id.* at 74. M█████ testified that normally B████ would only change out of her pajamas if she had bathed. However, Petitioner had told M█████ earlier in the day that B████ needed a bath. Therefore, it was unusual that she was not still wearing her pajamas. The pajamas B████ had been wearing on that morning were purple with a butterfly on it. M█████ found those pajamas in the bottom of the washer a few weeks after B████'s death. *Id.* at 81. They were damp and mildewed. M█████ testified that she had not washed the pajamas. *Id.* at 82.

2

8.      Petitioner started getting B████ out of her car seat when M████ took her from him and laid her out on the ground. B████ was not breathing, her lips were blue, and she was cold to the touch. *Id.* at 74. Lamar Mosely likewise testified that B████ was extremely pale—almost purple when he observed her on the sidewalk. *Id.* at 163. He also testified that when CPR was being performed on B████ a large quarter-sized clot of blood came out of B████'s mouth. *Id.* at 169.

9.      EMS arrived and transported B████ to Thomas Memorial which was the nearest hospital. Petitioner continued to tell M████ that it had just been a "normal day." *Id.* at 84. B████ remained at Thomas for approximately two hours before she was transported to CAMC Women's and Children's Hospital. *Id.* at 85.

10.     B████ was not breathing on her own and was hooked up to a ventilator. Once she was transported to CAMC, she was seen by Dr. Carceres. *Id.* at 86. The doctors performed numerous tests to determine whether B████ had any brain activity. Each of these tests showed no activity at all. Based upon the doctors' findings, M████ and T.J. decided to take B████ off the ventilator on October 3, 2010. *Id.* at 88.

11.     M████ remained in the room while B████ was taken off the ventilator. She never regained consciousness and was never able to breathe on her own. M████ stayed until B████'s lips turned blue—which was the way she looked when M████ pulled her out of her car seat. *Id.* at 89-90.

12.     M████ also testified regarding an incident that occurred six days prior to B████'s hospitalization. Only B████ and M████ were home at the time. *Id.* at 91-92. B████ was sitting on the bottom step of her stairwell playing with her toys. *Id.* at 92. She was sitting on that first step with her foot behind her other leg. *Id.* at 96. M████ called to her and when

3

B███ went to get up, her foot got caught and she fell backwards. M███ testified that B███ landed on her butt and she never saw B███ hit her head. *Id.* at 97. Detective Cook from the South Charleston Police Department testified that as part of his investigation, he measured the bottom step in M███'s house. Tr. Aug. 26, 2011 Trial at p. 99. The step measured six and a half inches. *Id.*

13. There was a plastic toy-four-wheeler at the bottom of the steps. *See* Tr. Aug. 24, 2011 trial at p. 107. M███ never saw B███ hit the four-wheeler and never saw the four-wheeler move forward. *Id.* Between the time of B███'s fall and her admission to the emergency room on September 30, 2010, M███ bathed and washed B███'s hair every day. She never felt any swelling or knots. She never observed any bruises and B███ never complained that her head hurt. *Id.* at 108-109.

14. After the fall, however, B███'s behavior indicated that her leg was hurting her. To be safe, M███ took her to Urgent Care to have B███'s leg examined. *Id.* at 98 She testified that the medical personnel at Urgent Care checked B███'s pupils. *Id.* at 99. When B███ still would not put weight on her leg, she took her to the emergency room at Women's & Children's Hospital. *Id.* at 101-102. Again, B███'s pupils were checked by medical personnel. *Id.* at 102.

15. B███ never gave M███ any indication that her head was hurting her. She never held her head or acted any differently, except for not wanting to use her leg. *Id.* at 102-103. She never vomited or lost consciousness. *Id.*

16. Trial in this matter began on August 22, 2011. An issue of contention during pre-trial matters was the admissibility of a statement that was taken by police after B███ had passed away. The Court held a suppression hearing prior to jury selection. *See* Tr. Aug. 22, 2011 trial

4

at pp. 6-27, 83-104, 133; *see also* Tr. Aug. 23, 2011 at pp. 35-61. Petitioner's trial counsel vigorously objected to the admission of the Petitioner's statement. *See* Tr. August 23, 2011 trial at pp. 36-61. There was no dispute that Petitioner was *Mirandized* prior to giving the statement to police. However, Petitioner's counsel argued that the statement was coerced given the length of the statement and the conduct of the officers. *See* Tr. Aug. 22, 2011 trial at p. 26.

17. Additionally, the Court ruled admissible a reenactment that was videotaped after Petitioner's statement. Tr. Aug. 23, 2011 trial at p. 59. In this reenactment, the Petitioner claimed that he was carrying B███ down the stairs when he fell with her and she hit her head. However, at trial, Petitioner's counsel argued that Petitioner was coerced into making up the story regarding the fall and that the video depicted a "ridiculous demonstration." *Id.* at 58-59. The State agreed that the fall depicted in the reenactment did not occur but argued it was relevant because it was an inconsistent statement given by the Petitioner. *Id.* at 58.

18. To establish that the statement was voluntary, the State called Detective B.A. Paschall. Det. Paschall testified at length regarding the circumstances surrounding the statement. *See* Tr. August 22, 2011 trial at pp. 6-26. Importantly, he testified that the interview took place in the kitchen area of the South Charleston Police Department. *Id.* at 18. He was *Mirandized* prior to given the statement. *Id.* at 20-21. Petitioner was given cigarette breaks and was not handcuffed the entire time of the interview and the reenactment. *Id.* at 92-93. Petitioner never requested a lawyer and never indicated he did not want to continue speaking with detectives. *Id.* at 94.

19. Additionally, the Court listened to the recorded statement between the first day and second days of trial. *Id.* at 84-85; *see also* Tr. Aug. 23, 2011 trial at 36. The Court ruled the statement admissible and while there was some discussion about playing portions of the

5

statement, the entire recording was played at trial. *Id.* at 45-61; *see also* Tr. Aug. 25, 2011 trial at p. 139.

20. At trial, Dr. Allen Mock testified for the State as an expert witness. *Id.* at 181. At the time, Dr. Mock worked at the West Virginia Medical Examiner's Office as a forensic pathologist. *Id.* at 188. Dr. Mock is currently Chief Medical Examiner for the State of West Virginia.

21. As to his education and training, Dr. Mock received his degrees in microbiology and biochemistry as well as a master's degree in microbiology, immunology, and parasitology. He received his medical degree from Louisiana State University. After that he trained in anatomic and forensic pathology at the University of Tennessee followed by training at the New Mexico University Office of the Chief Medical Examiner. *Id.* at 182. At the time of trial, he was board eligible in anatomic pathology and clinical pathology. *Id.* at 183.

22. Dr. Mock performed B████'s autopsy on October 4, 2010. *Id.* at 187-188. B████ had multiple contusions on her head. *Id.* at 198. She also had a laceration just left of her frenulum—the tissue that connected B████'s lips to her gums. That laceration was approximately an eighth of an inch long.

23. Once Dr. Mock was able to observe B████'s scalp and brain, he found numerous hemorrhages. B████ had subscapular hemorrhages and swelling, which occurred within the soft tissues in the scalp. *Id.* at 212. She had a subgaleal hemorrhage which measured approximately five inches by three inches. *Id.* at 213. She also had subdural and subarachnoid hemorrhages. *Id.* at 226. Her brain was also severely swollen. *Id.* at 230. The hemorrhages appeared to be acute—meaning they had occurred recently. *Id.* at 232-34. Additionally, Dr. Mock prepared

6

microscopic slides containing tissue from B████'s eyes—which showed diffuse intraretinal hemorrhages. *Id.* at 241.

24. B████ also had a skull fracture that measured five inches long and comprised approximately twenty percent of B████'s skull. *Id.* at 214-15. The fracture originated at the base of her skull and contained a hemorrhage within the fracture. *Id.* Importantly, Dr. Mock testified that he did not see any evidence of healing in B████'s skull fracture. *Id.* at 223.

25. Dr. Mock testified that it would have taken a significant amount of force to cause the injuries sustained by B████. Typically in children under the age of two, skull fractures of this severity are generally seen in high energy motor vehicle crashes. *Id.* at 247.

26. Dr. Mock also reviewed medical records and witness accounts regarding B████'s fall that occurred six days prior to her admission to the hospital. In his opinion, a fall of that nature would be insufficient to cause the degree of injury that B████ had. *Id.* at 248-49.

27. Dr. Mock found B████'s cause of death to be blunt force trauma and determined the manner of death to be homicide. *Id.* at 253-54.

28. Petitioner had retained an expert, Dr. Thomas Young, a board-certified forensic pathologist. The Court granted the Petitioner's motion to have his expert listen by telephone to the testimony of the State's expert witnesses. (*See* Tr. Aug. 22, 2011 trial at pp. 60-62). The Court also granted Petitioner's counsel's motion for a brief recess to confer with his expert prior to beginning his cross-examination. *Id.* at 67-68.

29. After Dr. Mock testified, the jury was adjourned for the evening—giving Petitioner's counsel the entire evening to consult with his expert witness before cross-examining Dr. Mock. *See* Tr. Aug. 24, 2011 trial at pp. 254-55.

7

30. On cross-examination, Petitioner's counsel questioned Dr. Mock extensively regarding his educational background. Dr. Mock testified that once you are board eligible—meaning you meet the minimal educational requirements as determined by the American Board of Pathology—then you may sit for the board examinations for anatomic pathology and clinical pathology if trained in that area. Once you receive board certifications in both of those areas of pathology, then you are eligible for the forensic pathology boards. *See* Tr. Aug. 25, 2011 trial at p. 9.

31. He also testified that he had taken the clinical pathology portion of the American Board of Pathology boards and was scheduled to take the anatomic portion of the boards in October of 2011. *Id.* at 10-11. Dr. Mock passed the clinical pathology portion the first time he took the test. *Id.* at 11.

32. In addition to his credentials, Petitioner's counsel cross-examined Dr. Mock at length regarding his experience, his methods during his autopsies, and possible other explanations for B███'s injuries. *Id.* at 5-61. In fact, the Court noted that the cross-examination lasted for an hour. *Id.* at 61.

33. The Court excused Dr. Mock as a witness the morning of August 25, 2011. *See* Tr. Aug. 25, 2011 trial at p. 95. After that, Petitioner's counsel had subpoenaed Dr. Mock to appear for trial on August 26, 2011 at 1:30 a.m. *See* Tr. Aug. 26, 2011 trial at pp. 200-201. The sole purpose for subpoenaing Dr. Mock was to impeach his testimony regarding the board certification examinations. *Id.* at 201-207. The Court refused to direct Dr. Mock to appear. *Id.* at 208

34. In addition to the testimony of Dr. Mock, the State also introduced expert testimony from Dr. Manuel Caceres. Dr. Caceres specializes in pediatric intensive care and

pediatrics. *Id.* at 147. Dr. Caceres testified that that in his opinion, B████'s injuries were consistent with shaken baby syndrome with impact. *Id.* at 176. He also reviewed the Petitioner's reenactment of the alleged fall down the stairs. In his opinion, a fall of that nature could not have caused B███'s injuries. *Id.* at 176-177.

35. Additionally, Dr. Caceres testified in the form of a hypothetical that a fall from a six-inch step would have been insufficient to cause the skull fracture and brain swelling suffered by B███ M████—even if her head had struck a plastic four-wheeler. *Id.* at 178-179.

36. As with Dr. Mock's testimony, the Court allowed the Petitioner's expert, Dr. Young, to listen to Dr. Caceres's testimony by phone. Petitioner's counsel was also allowed to confer with this expert by phone before cross-examining him. *Id.* at 198-199.

37. Dr. Young testified as an expert witness for the defense. He testified that in his opinion, B███'s five-inch skull fracture was caused by her fall off of a six-inch step that had occurred approximately six days before her admission to the ER. *Id.* at 284. Dr. Young testified on direct examination that in his opinion, the diagnosis of shaken baby syndrome has been falsified. *Id.* at 294. He also testified that he disagreed with Dr. Mock's assessment that B███'s skull fracture was a "fresh" fracture. *Id.* at 308. From his review of the photographs, Dr. Young's opinion was that the fracture showed signs of healing. *Id.* at 309.

38. On cross examination, Dr. Young opined that the "fall" depicted in the video reenactment when Petitioner alleged to have fallen down the steps while holding B███ did not happen. *Id.* at 353. His basis for that opinion was that the fall did not "fit the evidence." *Id.* Dr. Young also characterized B███'s skull fracture as a complex fracture. *Id.* at 357. Dr. Young also testified that his opinion was based upon the assumption that B███ actually hit her head on the plastic four-wheeler toy. *Id.* at 366.

9

39.    Petitioner's counsel began to ask Dr. Young regarding the board certification process. Counsel for the State objected and during a bench conference, Petitioner's counsel stated that he intended to ask Dr. Young about the board testing process and to make a conclusion that Dr. Mock must have failed part of the anatomical/clinical pathology boards. *Id.* at 324-328. The Court ruled that such questioning of Dr. Young would not be permitted. *Id.* at 329.

40.    Petitioner's trial continued into Saturday, August 27, 2011 when the parties presented closing arguments and the jury began deliberations. *See* Tr. Aug. 27, 2011 trial.

41.    On August 29, 2011—one week after trial began—the jury returned its verdict. The jury found Petitioner guilty of death of a child by parent, guardian, or custodian. *See* Tr. Aug. 29, 2011 trial at p. 14. On October 28, 2011, the Court sentenced the Defendant to a determinate term of forty (40) years in the penitentiary.

42.    On or around November 24, 2011, Petitioner filed a Notice of Intent to Appeal with the Supreme Court of Appeals of West Virginia ("West Virginia Supreme Court"). His petition raised assignments of error relating to the testimony of Dr. Mock. *See State v. Hayes*, 2013 WL 2149870 (May 17, 2013) (Memorandum Opinion). First, he argued that the trial court denied him the right to compulsory process when it refused to enforce Petitioner's subpoena of Dr. Mock. *Id.* at * 3. Second, he argued that the trial court violated his due process rights by refusing to allowing Dr. Young to given an opinion regarding Dr. Mock's testimony and directly impeach Dr. Mock's testimony regarding his credentials. *Id.* at * 4.

43.    In its opinion, the Court found that Petitioner was not entitled to the requested relief. Specifically, the Court noted the following regarding Dr. Mock's testimony: (a) Petitioner had been granted ample opportunity to investigate Dr. Mock's credentials prior to trial;

10

(b) Dr. Mock's direct testimony regarding his credentials put the defense on notice of a need to inquire on cross-examination; (c) the trial court postponed the Petitioner's cross-examination of Dr. Mock until the following day to allow the Petitioner to review Dr. Mock's testimony with Petitioner's expert; (d) the defense did not reserve the right to call Dr. Mock after the cross-examination was finished; and (e) Petitioner subpoenaed Dr. Mock to answer a question that had already been answered—that he had not yet taken the anatomic pathology examination. *Id.* at *3.

44.    The Court also found that the trial court did not deny the Petitioner the right a complete defense "by prohibiting Dr. Young from *speculating*, in the presence of the jury, whether Dr. Mock *may* have failed the anatomic pathology exam." *Id.* at *5 (emphasis in original). Petitioner offered no evidence that Dr. Young was an expert regarding board examination procedures. *Id.*

45.    On April 2, 2014, Petitioner filed the instant Petition for Writ of Habeas Corpus asserting that both his trial counsel and appellate counsel were ineffective. Specifically, he alleges that his trial counsel was ineffective by (a) deficient performance relating to the Petitioner's statement that was introduced against him at trial; (b) deficient performance in failing to meaningfully cross-examining Dr. Mock; and (c) deficient performance in litigating the issue of insufficient evidence. Regarding his appellate counsel, Petitioner alleges that his counsel was ineffective by failing to raise additional claims on direct appeal.

## II.    CONCLUSIONS OF LAW

46.    West Virginia's post-conviction habeas corpus statute "clearly contemplates that [a] person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one postconviction habeas corpus proceeding." Syl. Pt. 1, *Markley v. Coleman*, 215 W.Va. 729

11

(2004) (citations omitted). Such proceeding gives the Petitioner an opportunity to "raise any collateral issues which have not previously been fully and fairly litigated." *Id.* at 732. The initial habeas corpus hearing is *res judicata* as to all matters raised and to all matters known or which, with reasonable diligence, could have been known. *Id.* at Syl. Pt. 2.

47.    A circuit court having jurisdiction over habeas corpus proceedings has broad discretion in dealing with habeas corpus allegations. *Id.* at 733. It may deny the petition without a hearing and without appointing counsel if the petition, exhibits, affidavits and other documentary evidence show to the circuit court's satisfaction that the Petitioner is not entitled to relief. *Id.* at Syl. Pt. 3. A circuit court may also find that the habeas corpus allegation has been previously waived or adjudicated and if so, the court "shall by order entered of record refuse to grant a writ and such refusal shall constitute a final judgment." *Id.* at 733 (citing W.Va. Code section 53-4A-3(a)).

48.    When determining whether to grant or deny relief, a circuit court is statutorily required to make specific findings of fact and conclusions of law relating to each contention advanced by the petitioner and to state the grounds upon which each matter was determined. *Id.* at Syl. Pt. 4. *See also* W.Va. Code section 53-4A-3(a).

49.    In West Virginia, ineffective assistance of counsel claims are to be governed by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See State v. Miller*, 194 W.Va. 3 (1995); *State ex rel. Quinone v. Rubenstein*, 218 W.Va. 388 (2005); *State v. Frye,* 221 W.Va. 154 (2006). First, a court must determine if counsel's performance was deficient under an objective standard of reasonableness. Second, a court must determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Miller*, 194 W.Va. at 16.

12

50.    The West Virginia Supreme Court has long held that:

> In reviewing counsel's performance, courts must apply an
> objective standard and determine whether, in light of all the
> circumstances, the identified acts or omissions were outside
> the broad range of professionally competent assistance while
> at the same time refraining from engaging in hindsight or second
> guessing of trial counsel's strategic decisions. Thus reviewing
> court asks whether a reasonable lawyer would have acted, under
> the circumstances, as defense counsel acted in the case at issue.

51.    As to the sufficiency of Petitioner's trial counsel's performance, the Petitioner first alleges that trial counsel's performance was deficient for failing to convince the Court that the third statement Petitioner gave to the South Charleston Police Department was coerced.

52.    The Court **FINDS** that Petitioner's allegation regarding the statement fails. Petitioner's counsel argued vigorously over the course of a suppression hearing that ran into two days that Petitioner's statement was coerced. The Court considered the arguments of counsel and the testimony regarding the circumstances under which the statement was taken.

53.    When determining the voluntariness of a statement, the Court must look at the totality of the circumstances. Syl. Pt. 2, *State v. Bradshaw*, 193 W.Va. 519 (2009). Factors to be considered include the defendant's age, intelligence, background and experience with the criminal justice system, the purpose and flagrancy of police misconduct, and the length of the interview. Furthermore, the moral and psychological pressure to confess should also be considered. *Id.* at 527.

54.    Rulings on the admissibility of evidence are largely within the trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." Syl. Pt. 9, *State v. Newcomb*, 223 W.Va. 843 (2009). It is a well-established rule in West Virginia "that a trial court has wide discretion in regard to the admissibility of confessions and ordinarily this discretion will not be disturbed on review." A trial court's decision regarding the voluntariness

13

of a confession will not be disturbed unless it is plainly wrong or against the weight of the evidence. *State v. Black*, 227 W.Va. 297, 304 (2010).

55. The Court **FINDS** that the length of Petitioner's interview with police was zealously argued by Petitioner's counsel. The interview lasted for approximately two and a half hours. He was never handcuffed during the interrogation and he was given cigarette breaks. In *Bradshaw*, the Court found a statement that was given during a six-hour interrogation was voluntary. 193 W.Va. at 526, 535. In *Bradshaw*, similar to the circumstances here, the Petitioner was not deprived of any necessities and was given the opportunity for smoke breaks. This Court was clearly within its discretion to find that the statement was voluntary.

56. Even if it is assumed that Petitioner's counsel's performance was deficient in failing to convince the trial court to exclude the statement, Petitioner still must establish that the outcome would have been different if the statement had been excluded. It is important to note that the Petitioner never "confessed" to shaking, striking, or otherwise abusing B███ Towards the end of the statement, he told the police that he fell while carrying B███ down the stairs. He also performed a reenactment of this "fall." All the experts—even Petitioner's expert—agreed that the fall that was depicted by Petitioner would not have caused the injuries to B███. Given that the Petitioner made no real admissions to hurting B███, the Court **FINDS** there Petitioner has failed to present any credible argument that excluding the statement would have resulting in the Petitioner being acquitted.

57. As to Petitioner's allegations regarding Dr. Mock, the Court **FINDS** that these allegations fail as well. Dr. Mock is the current Chief Medical Examiner for the State of West Virginia. Petitioner alleges that Dr. Mock was not qualified to perform autopsies in West Virginia in October of 2010. In support of that assertion, he cites W.Va. Code section 61-12-10

14

which provides that a county medical examiner must be "a pathologist who holds board certification or board eligibility in forensic pathology or has completed an American Board of Pathology fellowship in forensic pathology."

58.     There is no dispute that Dr. Mock, at the time B████'s autopsy was performed, was not board certified in forensic pathology. However, Dr. Mock testified that he completed fellowship training in forensic pathology at the New Mexico University Office of the Chief Medical Investigator in Albuquerque. Tr. Aug. 24, 2011 Trial at p. 182. Dr. Mock also testified that he had testified as an expert witness in the field of forensic pathology in both New Mexico and West Virginia state courts and federal courts. *Id.* at 184.

59.     Additionally, the State provided Petitioner's counsel with an expert witness disclosure prior to trial. Dr. Mock's curriculum vitae clearly indicates that he served as a Forensic Pathology Fellow from July 2009 until June 2010. The Court **FINDS** Petitioner simply fails to establish that Dr. Mock was not qualified to perform an autopsy in West Virginia and fails to establish that Dr. Mock was not qualified as an expert witness.

60.     In addition to Petitioner's counsel's vigorous cross-examination of Dr. Mock, Petitioner presented his own expert witness, Dr. Young, to present an alternative theory as to the cause of B████ s skull fracture and injuries. The jury heard testimony from Dr. Young that he was board certified in forensic pathology and that he had many years of experience in the field. The jury heard Dr. Young criticize certain aspects of Dr. Mock's autopsy on B████—particularly that he did not take tissue samples of the skull fracture to further test for evidence of healing. The Court **FINDS** that the jury heard all of the evidence and gave what weight and credibility to Dr. Young's testimony that it believed it deserved.

15

61. Again, Petitioner must show that trial counsel's performance was deficient. The Court FINDS that Petitioner fails to establish any deficiency. Trial counsel vigorously cross-examined Dr. Mock regarding his experience and credentials. Petitioner's counsel also offered a competing expert to refute Dr. Mock's opinions—which the jury rejected. The opinion offered by Dr. Young was that B█████ suffered a five-inch skull fracture six days prior to her admission to the hospital. He opined that she suffered such an injury when she fell from a six-inch step, hitting her bottom on the floor, and her head hiting a plastic toy four-wheeler. Furthermore, he opined that B█████ remained asymptomatic until six days later when she had a post-traumatic seizure which led to the hemorrhages and additional complications, which eventually led to her death. The Court FINDS that the jury heard all of this evidence and presumably rejected Dr. Young's opinion.

62. Additionally, the State presented evidence from another expert witness, Dr. Manuel Caceres. Dr. Caceres was board certified in pediatrics and treated B█████ in the pediatric intensive care unit. There were no possible attacks on his credentials in his respective field. He also testified that he believed, to a reasonable degree of medical certainty, that B█████ had been the victim of abuse—specifically shaken baby syndrome with impact. In his opinion, that was the only medical explanation for the injuries she received.

63. Given the weight of the evidence the State presented at trial, this Court FINDS that Petitioner has presented no credible evidence that if the Petitioner had been given the opportunity to question Dr. Mock again regarding his credentials, the outcome of the trial would have been different. Therefore, his claim for relief on that ground must fail.

64. Petitioner also alleges that his trial counsel was ineffective in failing to litigate the issue of insufficient evidence. He simply argues that "had counsel argued for acquittal on the

16

basis that there was insufficient evidence to convict as outlined in *State v.* Guthrie, supra, a reasonable probability exists that Petitioner would have prevailed." *See* Petitioner's Memorandum in Support of Writ of Habeas Corpus Ad-Subjiciendum at p. 27.

65. Attacks on sufficiency of the evidence must overcome a high burden to be considered by a court. Specifically, the Supreme Court has found

> [a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with ever conclusion save that of guilt so long as the jury can find guilty beyond a reasonable doubt. Credibility determinations are for a jury and not for an appellate court. Finally a jury verdict should only be set aside when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657 (1995).

66. While Petitioner asserts that under *Guthrie*, his counsel would have likely prevailed on an insufficient evidence argument, the Court **FINDS** that this is nothing more than a bald assertion. *Guthrie* makes it clear that "a jury verdict should only be set aside when the record contains *no* evidence....from which the jury could find guilt." *Id.* (emphasis added). There was more than ample evidence presented in this case to convict Petitioner.

67. This Court **FINDS** that that the weight of evidence presented against Petitioner at trial was more than sufficient to sustain his conviction. It is undisputed that the Petitioner was the only one with B█ the day of September 30, 2010. She had been fine that morning when they dropped M█ off at work. He gave statements to the police that did not make sense. He told police that she slumped over when they were pulling into Trace Fork and that was the first time he noticed anything wrong. However, when he pulled into IHOP—just yards from the

17

Trace Fork turn—she was already blue from loss of oxygen. M████testified that there would have been no reason to have changed B███ out of her pajamas because she had not yet been bathed. However, Petitioner had changed her clothes and weeks later, M████ found those pajamas in the washing machine. Petitioner made a statement in a jail call to his father that he didn't mean to hurt her [B███ like that.

68.     In addition to the circumstantial evidence that existed in the case, the Court FINDS there was ample medical evidence that B███'s injuries were the result of abuse and that her injuries were acute to her admission to the emergency room on September 30, 2010. The medical evidence presented by the State was compelling and credible—even when compared to the expert testimony provided by Petitioner's expert, Dr. Young.

69.     As to Petitioner's allegation that his appellate counsel was ineffective, the analysis begins with the question as to whether the counsel's failure to appeal was so "outside the broad range of professionally competent assistance" that it constituted ineffective assistance of counsel. *See* Miller, 194 W.Va. at Syl. Pt. 6. It should be assumed that an attorney's performance was reasonable and adequate and Petitioner must rebut that presumption. *Id.* The Petitioner must also show that the result of the proceedings would have been different had counsel raised this issue on appeal. *Id.*

70.     As with his trial counsel, the Court FINDS that Petitioner cannot meet the heavy burden imposed on him in establishing ineffective assistance of appellate counsel. Petitioner's memorandum is not clear as to what issues he believes appellate counsel should have raised on appeal, but it can be assumed that Petitioner is referring to the claims for relief raised in his habeas corpus petition. Attorney Jason Parmer, who works in the Appellate Division of the Public Defender's office, handled the appeal for Petitioner. He appealed the trial court's refusal

18

to enforce Petitioner's subpoena for Dr. Mock and its refusal to allow trial counsel to elicit an opinion from Dr. Young regarding Dr. Mock's credentials. *See Hayes, 2013 WL 2149870* at *1-3. The Court found that the trial court's rulings were proper. *Id.* at *3-5.

71. This Court **FINDS** that the fact that his appellate counsel chose not to appeal the trial court's decision regarding the admission of Petitioner's statement and trial counsel's failure to litigate sufficiency of the evidence to convict Petitioner does not establish that his performance on appeal was deficient. Furthermore, Petitioner cannot show that had counsel raised those issues on appeal, the West Virginia Supreme Court would have reversed Petitioner's conviction. In fact, given the well-established jurisprudence on the subject matter, Petitioner's appellate counsel was well within "professional competence" so as to not present frivolous arguments on appeal. Appellate counsel could not show that the trial court abused its discretion in admitting the statement and likewise, could not show that there was "no evidence" of guilt to support the jury verdict. Therefore, the Court **FINDS** that Petitioner's claim for relief based upon ineffective assistance of appellate counsel also fails.

### III. RESOLUTION

Based upon the foregoing, the Court **DENIES** Habeas Petition 14-P-163 and **ORDERS** the matter stricken from the docket. The Court notes the Petitioner's objection and exception to its ruling. The Court further **ORDERS** certified copies of this Order be provided to counsel of record and Petitioner.

ENTER THIS _22_ day of ____Aug.____ , 2014

_____
The Honorable Paul Zakaib, Jr., Judge
Thirteenth Judicial Circuit

19