421 S.E.2d 511

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Donald Wayne TRIPLETT, Defendant Below, Appellant.**

No. 20172.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 21, 1992.

Decided July 23, 1992.

Kristen L. Keller, Deputy Pros. Atty., of Raleigh County, Beckley, for appellee.

Leo Catsonis, Charleston, for appellant.

WORKMAN, Justice:

This case is before the Court upon the appeal of Donald Wayne Triplett from a March 21, 1990, final order denying post-trial motions and imposing a sentence of life imprisonment without the possibility of parole. On March 16, 1990, a jury found the appellant guilty of first degree murder without a recommendation of mercy for the November 23, 1989, murder of Jeffrey Dean Houck. The appellant alleges that the following errors were committed by the lower court: 1) the circuit court erred in refusing to grant the defense motions for acquittal and for a new trial for the conviction of first degree murder on the grounds that there was insufficient evidence of pre-meditation or malice to support a conviction for murder; 2) the circuit court erred in permitting Dr. Sopher, the medical examiner, to testify repeatedly in areas outside his field of expertise and to testify to the "impossibility" of accidental death and to the ultimate issue; 3) the cumulative effect of several errors committed by the circuit court dealing with the taking of notes by jurors, failure to require the State to furnish discovery material, permitting the prosecutor to make improper jury argument, refusal to set aside the jury's recommendation of no mercy and the giving and refusal of certain instructions, was to deny due process to the defendant; and 4) the defendant was denied his right to effective assistance of counsel in the representation rendered by the assistant public defender. Upon a review of the record, the arguments of the parties and all other matters submitted before this Court, we find no error was committed by the trial court and affirm the conviction.

On November 24, 1989, the defendant was with the nineteen-year-old victim Jeffrey Houck, seventeen-year-old Curtis Goff and Michael Hamrick, an adult. Michael Hamrick testified that the defendant was driving them around to various establishments and obtaining alcohol for Hamrick, Houck and Goff to consume. The evidence indicated that the defendant was neither drinking nor taking drugs. Around 9:00 p.m., the defendant took them to a convenience store, where he went in to buy beer.

Hamrick testified that while the defendant was in the store, the victim, Houck, moved the defendant's car around to the side of the convenience store. Houck was playing a joke on the defendant when he moved the car. Hamrick's testimony indicated that when the defendant discovered that Houck had moved his car, he got mad and the defendant and Houck proceeded to argue.

Shortly after 9:00 p.m., the group left the convenience store and, according to Hamrick, the victim punched the defendant while he was driving and then told the defendant to pull the car over off the road. The victim proceeded to tell the defendant that "he was going to whip his [the defendant's] butt." Once the car was off the road, the victim grabbed the car keys and jumped out of the car first. Hamrick indicated that the victim did not have a bottle of beer in his hands when he got out of the car.[1] The significance of the beer bottle was that the defendant claimed in his pre-trial statement that the victim could have had a beer bottle when he got out of the car, but that the defendant didn't know for certain. The defendant got out of the car on the driver's side and walked around the back of the car and back up to where the victim was standing, outside the front passenger side of the car.

---

1. Detective William R. Garaffa, a deputy with the Raleigh County Sheriff's Department, testified that the investigation also revealed that the victim did not have a beer bottle in his hands when he got out of the car before he was stabbed. Moreover, the detective's testimony indicated that one of the other men in the car made a statement that he had thrown the beer bottle out of the car.

Hamrick testified that although he did not see the actual infliction of the fatal wound, he did observe that before there was time for any conversation between the victim and the defendant, the defendant went forward and the victim hit the ground. Hamrick's testimony revealed he got out of the car and observed blood coming from the victim. At this point, Hamrick indicated that a car with three boys in it stopped to help, and the boys helped put Houck into the defendant's car. The defendant then drove Houck, along with Hamrick and Goff, to the emergency room of Appalachian Hospital.

Before a member of the Raleigh County Sheriff's Department arrived at the hospital, Hamrick testified that the defendant concocted a lie to tell the authorities concerning the circumstances surrounding the victim's injury. According to Hamrick, they agreed to tell the authorities that they were on the road at the Crossroads Mall when a vehicle pulled up next to them and one of the occupants of the other car "gave the finger and we pulled off and they got out and a dude supposedly stabbed him...." This concocted story was relayed to Detective Bolen by the defendant on November 23, 1989, in the defendant's statement to the police which was also admitted in evidence.

Curtis Goff, also present at the time of the incident, corroborated the testimony given by Michael Hamrick. Additionally, the three good samaritans, Robert Hoppe, Scott Williams and James Rhodes, who stopped to offer assistance when they saw the victim lying on the side of the road, testified. Robert Hoppe indicated that as soon as they finished helping place the victim into the car, the driver drove away. The three good samaritans tried to follow the car but lost it. They eventually located the victim and the other men at Appalachian Hospital, according to Hoppe.

Next, Detective Arthur R. Bolen, a deputy sheriff with the Raleigh County Sheriff's Department, testified that he interviewed the defendant when he arrived at the hospital and that the defendant did not appear to be intoxicated. The detective testified that he put out a radio broadcast seeking the apprehension of three individuals in a light-colored car based upon the statement given to him by the defendant.

The detective then went to the crime scene described by the defendant, where blood samples, cigarette butts, a purple lighter and a Budweiser beer bottle were collected as physical evidence. Detective Bolen requested that the defendant, Hamrick and Goff accompany him to the crime scene in order to help identify the area and the evidence seized.

The detective further testified that around noon on November 24, 1989, the defendant, accompanied by his mother, gave a second statement to the police, after being advised of his *Miranda*[2] rights. In this second statement, the defendant admitted that the first statement was a lie. The defendant stated that he pulled a knife on the victim because he was scared of him, but that the victim somehow accidentally fell on the knife. The defendant was adamant that he never intended to harm the victim. Additionally, the defendant's mother gave the police a butterfly knife which was determined to be the murder weapon. The knife was admitted in evidence at trial.

Finally, Dr. Irvin M. Sopher, the Chief Medical Examiner for the State of West Virginia, testified that the victim had a blood alcohol level of 0.22%. Further, the cause of death, according to Dr. Sopher, was "a stab wound of the chest which more specifically entered his heart and caused him to bleed externally and internally...." The doctor also testified that "a very forceful thrust" was required to inflict the four to five inch wound into the victim. The doctor's testimony finally revealed that it was not possible for the victim to have received the fatal wound by falling upon the knife.

The defense was accidental killing. The defendant's witnesses included Billy Gunter, Jr., who testified that the victim had been at Gunter's home around 8:00 or 8:30 p.m. on November 23, 1989, just shortly

---

2. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

before the stabbing. Gunter's testimony revealed that the victim had fallen on a freshly-waxed floor because he was intoxicated. This testimony was offered to establish not only that the victim was intoxicated, but that the victim was intoxicated to the point that he could have fallen on the knife.

The defendant also testified that while he might have been a little angry at the victim for moving his car, he was not really mad at him. He indicated that the victim was a good friend of his because they ran around together. However, when asked if he could think of anything good about the victim other than running around together, the defendant responded "[n]ot really." The defendant also stated that the victim hit him twice [3] while he was driving away from the convenience store. The defendant's testimony also revealed that the victim told him " '[p]ull over and I will kick your 'F'ing ass.' " When he pulled over, the victim got out of the car with the keys. The defendant stated that he tried to talk the victim into giving him back the keys and forgetting about the whole incident. The defendant's testimony reflected that the reason he pulled the knife on the victim was because he was scared of him due to the victim's intoxication. The defendant further testified that the victim was twice his size and that he had seen the victim pull a tire iron and a baseball bat on other people. He also testified that he had seen the victim threaten to kill people on prior occasions. Finally, the defendant's best recollection of how the victim's wound was inflicted was that he didn't really know whether the victim had come at him, dove at him or fell on the knife. He testified that he gave the false statement to police because he was scared.

Based upon all the evidence presented, the jury returned a guilty verdict upon which the present appeal is based.

## SUFFICIENCY OF EVIDENCE

■ The first assignment of error involves the trial court's refusal to grant the defendant's motions for acquittal and for a new trial for the conviction of first degree murder based upon the insufficiency of the evidence offered to prove premeditation or malice necessary to support a murder conviction.[4] The appellant argues that the evidence presented by the State affirmatively shows an absence of malice or premeditation which would make the inference of malice from the use of a deadly weapon alone improper. The State, on the other hand, asserts that the evidence presented to the jury showing that a sober defendant intentionally used a deadly weapon to kill an unarmed victim following an argument between the defendant and the victim, coupled with evidence that the defendant

---

3. The defendant indicated in his second statement to police that he was not harmed by the two punches he received from the victim.

4. Defense counsel hints for the first time on appeal that the defendant suffered from a "traumatic black-out" at the time of the murder in an attempt to show that the defendant acted without malice or premeditation. Counsel further alludes to defendant's mental problems, including an attempted suicide in March 1988 when he was discharged from the army due to a diagnosis of an adjustment disorder with depressed mood. Moreover, defense counsel attempts to show the defendant was remorseful based upon him talking of taking his own life. However, the evidence shows that comment was made to Goff and Hamrick as the defendant was trying to convince them to stick to the lie that he had concocted and told police. Further, the comment was more to the effect that the defendant would rather kill himself than go to jail.

At the post-conviction hearing, there was evidence that the defendant tried to commit suicide after the trial concluded; however, there was no other evidence introduced to show any other of the mental problems now alleged. Even defense counsel acknowledged at that post-conviction hearing that there was not sufficient credible medical evidence to support a finding that the defendant acted under a mental disease or defect. Additionally, counsel acknowledged that this was not properly preserved for appeal. Finally, the defendant's competency was not challenged before the lower court. In syllabus point 8 of *State v. Dietz,* 182 W.Va. 544, 390 S.E.2d 15 (1990) (quoting Syl.Pt. 6, *State v. Byers,* 159 W.Va. 596, 224 S.E.2d 726 (1976)), we held that " '[t]his Court will not consider an error which is not preserved in the record nor apparent on the face of the record.' " *See* W.Va.R.Evid. 103.

armed himself with a knife in anticipation of killing and then lied to police regarding the killing constitutes sufficient evidence to prove the elements of malice and premeditation.

 In syllabus point 1 of *State v. Starkey,* 161 W.Va. 517, 244 S.E.2d 219 (1978), this Court held, in pertinent part, that "[t]o warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done." The appellant maintains that the evidence was "manifestly inadequate" by relying upon this Court's holding in syllabus point 2 of *State v. Brant,* 162 W.Va. 762, 252 S.E.2d 901 (1979) that:

> Malice may be inferred from the intentional use of a deadly weapon; however, where the State's own evidence demonstrates circumstances affirmatively showing an absence of malice which would make an inference of malice from the use of a deadly weapon alone improper, a conviction for second degree murder cannot be upheld.

The holding of *Brant,* however, was specifically limited to the facts of that case, which were that the appellant and the decedent were close friends and constant social companions who never engaged in any arguments, including the night of the shooting. The two also planned to be future business partners. *Id.,* 162 W.Va. at 763–64, 252 S.E.2d at 902–03. Additionally, both the appellant and the decedent had blood alcohol levels of approximately .29% at the time of the shooting. *Id.,* 162 W.Va. at 766, 252 S.E.2d at 902–03. Finally, the shooting incident took place suddenly and for no apparent reason, with the appellant demonstrating shock, crying and exclaiming " 'No, don't tell me I killed David.' " The appellant also expressed a desire to kill himself. *Id.,* 162 W.Va. at 765, 252 S.E.2d at 903.

We disagree with the assertion of the defendant in the present case that "[t]he *Brant* case is on all fours with the instant case." The evidence indicates that while the defendant claimed he and Houck were good friends, he couldn't state one good thing about him. Further, there was no evidence that the defendant was intoxicated at the time of the murder. The evidence did, however, reflect that the two men were arguing heatedly just prior to the incident. Even though the defendant claimed he was scared of the victim, the evidence showed that the victim was unarmed at the time the fatal wound was inflicted. Further, the defendant got out on the driver's side of the automobile and walked around the back of the automobile before stabbing the victim. Consequently, this is not a case of the incident occurring suddenly and without explanation.

Thus, we conclude that sufficient evidence existed for the jury to find that the defendant acted with both premeditation and malice. Therefore, the lower court did not err in denying the defendant's motions for acquittal and for a new trial.

### EXPERT TESTIMONY

 Next, the appellant asserts that the trial court erred in permitting Dr. Sopher, the medical examiner, to testify repeatedly in areas outside his field of expertise, to testify to the impossibility of the accidental death and to testify to the ultimate issue. The State, however, maintains that a medical examiner who is qualified as an expert in forensic pathology may testify to the cause and manner of death, including matters that embrace the ultimate issue to be decided by the trier of fact.

West Virginia Rule of Evidence 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion of otherwise." Further, West Virginia Rule of Evidence 704 states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." The disputed testimony at issue is as follows:

(by the Prosecuting Attorney):

Q: Doctor, from your examination of Jeffrey's body and the autopsy, were you able to form a conclusion as to whether or not it was possible that Jeffrey received this fatal injury by falling upon the knife ...?

. . . .

A: Yes, that's not possible.

Q: And were you able—I will give you a list of other verbs and then ask you at the end rather than go through each one, were you also able to form a conclusion as to whether it was possible with the knife ... being held in the hands of another, that Jeffrey Houck received this fatal wound by stumbling on the knife, by diving on the knife, by stepping into the knife, by jumping on the knife, by running or walking into the knife; is, are any of those things possible?

A: No, ma'am, they are not.

The medical examiner then went on to testify, based upon the external examination and the autopsy, why those hypothetical situations were not possible. Essentially, Dr. Sopher stated that the stab wound inflicted upon the victim was four to five inches deep and that "an upright individual or individual lying down or what have you holding a knife in his hand and a body falling on the arm, you cannot get ... [the] kind of force" necessary to create the severity of injury received by the victim.

This Court has previously held in *State v. Clark*, 171 W.Va. 74, 77–78, 297 S.E.2d 849, 853 (1982) that a medical examiner may give an opinion as to the physical and medical cause of death. Further, in *State v. Smith*, 178 W.Va. 104, 107 n. 1, 358 S.E.2d 188, 191 n. 1 (1987), we found no error in allowing a medical expert to testify that a gunshot wound causing death was not self-inflicted. Consequently, upon review of the expert's testimony in this case, we find no error was committed by the lower court in admitting the testimony into evidence.

## CUMULATIVE EFFECT OF ERRORS

■ The appellant also argues that the cumulative effect of several errors committed by the trial court dealing with the taking of notes by jurors, failing to require the State to furnish discovery material, permitting the prosecutor to make improper jury argument, refusing to set aside the jury's recommendation of "no mercy" and the giving and refusing to give certain instructions was to deny due process to the defendant. In contrast, the State contends that in the absense of any showing of prejudicial error, a conviction and sentence are not reversible.

Only two of the cumulative errors alleged by the appellant need to be addressed with some particularity. First, the appellant maintains that the lower court erred in permitting the jurors to take notes during the trial, claiming that note-taking has a tendency to distort the evidence and might have a tendency to allow one juror to overpower other jurors, particularly in view of the high rate of illiteracy in West Virginia. The record, however, reveals that the defense counsel was permitted to ask the jury panel whether anyone would have problems in taking notes because of a lack of ability to read and write. Further, the court offered to allow defense counsel to conduct an individual voir dire on the issue, but no individual voir dire was pursued.

Moreover, the appellant erroneously claims that the trial court did not give a cautionary instruction on note-taking. The trial court specifically instructed the jury as follows:

As has been mentioned, you are permitted to take notes during the trial. You are not required to take notes but you are permitted to take notes if you choose to do so. Please remember that the notes that you take are to be an aid in your memory but not a substitute for it. Therefore, do not try to write down every word that is said. Listen to the witnesses and watch them and remember their testimony. You may take notes if you choose to in order to help your memory but it is your memory upon which you should rely in recalling the testimony. If you choose to take notes your notes must be your own. Do not look at another juror's notes and do not share, show your notes to another juror. I

mentioned earlier that you must not discuss the case among yourselves until you begin to deliberate at the end of the trial, but by the same token if you begin to compare notes before the end of the trial then that's a form of deliberation. So, for the same reason, you must not look at each other's notes or compare notes during the trial. So, if you miss something that you were trying to write down you can't look at your neighbor and say "What was that?" Don't do that. It's from your notes and your notes only.

For this purpose each of you will be given a clipboard and notepad and pencil after opening statements. When you get the pad write only your name on the front sheet, just your name, so that we will know whose, who it belongs to and then begin your notes on the second sheet; that way there is always a cover sheet and no one can inadvertently see your notes.

The bailiff will collect your notepads at the lunch break and at evening breaks and redistribute them to you as we reassemble; and during the recesses no one will look at your notes, and that includes me. I won't look at them either. They are your private notes for your use only.

Take notes only of the evidence. You will not be permitted to take notes of opening statements or closing summation or Court's instructions. And remember this is optional for you; you can just choose not to altogether if you don't want to.

■ This Court has previously held that [t]he court may permit the jury to take to their room, when they retire to consider of their verdict, any paper read in evidence before them; and, at the request of the jury or any one of them, it may allow a paper to be read to them a second time, and any juror has the right to make notes therefrom when it is so read.

Syl.Pt. 5, *Koontz, Phillips & Stamm v. Mylius*, 77 W.Va. 499, 87 S.E. 851 (1916). The *Mylius* court upheld jurors taking notes during plaintiff's counsel's reading of a written estimate, prepared by one of the

witnesses of timber cut and removed by the defendant in a trespass action. *Id.*, 77 W.Va. at 504–05, 87 S.E. at 853. The plaintiff's counsel read the written estimate during the plaintiff's opening statement. *Id.* Moreover, the *Mylius* court indicated that permitting note-taking during a trial was within the discretion of the trial court and "unless it clearly appears that there has been such abuse of discretion as will prejudice the party complaining, the verdict will not be disturbed." *Id.*, 77 W.Va. at 505, 87 S.E. at 853.

It is clear that a majority of both state and federal jurisdictions have found that it is proper to permit jurors to take notes during trial. *See United States v. MacLean*, 578 F.2d 64 (3d Cir.1978); *Esaw v. Friedman*, 217 Conn. 553, 557–61, 586 A.2d 1164, 1167–68 (1991); *People v. DiLuca*, 85 A.D.2d 439, 440–41, 448 N.Y.S.2d 730, 732 (1982); Annotation, *Taking and Use of Trial Notes By Jury*, 14 A.L.R.3d 831, 834 (1967 and Supp.1991). Moreover, most of those same jurisdictions have also held that the decision of whether to permit the jury to take notes during trial is within the sound discretion of the trial court. *See United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir.1986); *MacLean*, 578 F.2d at 65; *Esaw*, 586 A.2d at 1167–68; *DiLuca*, 85 A.D.2d 439, 448 N.Y.S.2d at 733.

The rationale for allowing jurors to take notes was best stated by the *MacLean* court: "The obvious and strongest argument in favor of allowing note-taking is that, when done properly, it is a valuable method of refreshing memory. In addition, note-taking may help focus jurors' concentration on the proceedings and help prevent their attention from wandering." 578 F.2d at 66. Further, the *MacLean* court was convinced that "the dangers of note-taking [by jurors such as the best or only note-taker dominating the jury deliberations] can be substantially avoided by proper instruction to the jury." *Id.; see Esaw*, 586 A.2d at 1169.

The court in *MacLean* indicated that the jury should be instructed to give precedence to each of their independent recollections rather than the notes; that a juror

should not allow himself to be influenced by another juror who had taken notes; that the jury should not allow themselves to be distracted from the proceedings by note-taking; and, that the jurors should only disclose the contents of their notes to another juror. 578 F.2d at 66.

■ The instruction given in the present case fully informs the jurors of the proper and improper use of their notes, if taken. Consequently, we hold that it is a permissible practice to allow jurors to take notes on the evidence during trial as long as proper voir dire is permitted concerning the jurors' capacity to take notes, and a cautionary instruction is given concerning the proper and improper uses of note-taking. The ultimate decision on whether to allow note-taking by the jury lies within the sound discretion of the trial court.

■ Second, the appellant argues that the trial court erred in refusing to reject the recommendation of "no mercy" by the jury because the "no mercy" recommendation was clearly contrary to the evidence and also contrary to this Court's decision in *Schofield v. West Virginia Department of Corrections*, 185 W.Va. 199, 406 S.E.2d 425 (1991). In contrast, the State maintains that the *Schofield* decision confirms that the trial court exceeds its authority in modifying a first degree murder conviction without a recommendation of mercy to one with a recommendation of mercy.

■ West Virginia Code § 62–3–15 (1989) provides, in pertinent part, that:

[i]f the person indicted for murder is found by the jury guilty thereof, and if the jury find in their verdict that he is guilty of murder of the first degree ... he shall be punished by confinement in the penitentiary for life, and he, ... shall not be eligible for parole: Provided, That the jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person shall be eligible for parole....

Moreover, while the *Schofield* decision does stand for the proposition that defense counsel has a duty to present evidence in support of mitigation or mercy, this Court specifically held that:

[w]hen a circuit court determines in a post-conviction habeas corpus proceeding that assistance of counsel in a homicide was ineffective, the circuit court has no authority to modify the original final judgment to award a recommendation of mercy when none was awarded by the jury that heard the case.

185 W.Va. at 250, 406 S.E.2d at 426, Syl.Pt. 4.

■ Thus, under both statutory and case law, the recommendation of mercy in a first degree murder case lies solely in the discretion of the jury. Therefore, it would be improper for the trial court to set aside a jury verdict of first degree murder without a recommendation of mercy in order to give a recommendation of mercy. Consequently, no error was committed by the lower court in its refusal to change the jury verdict and enter a recommendation of mercy.

Upon review of the record in this case, we summarily dismiss the alleged errors regarding the failure of the State to furnish discovery material, the prosecutor's alleged improper jury argument and the giving and refusing to give certain jury instructions.

First, the discovery material which allegedly was not received by the defendant consisted of a forensic report of a blood sample, the statements of the three men who dropped by the scene that apparently contained statements by the defendant to the men that the victim had cut himself on a beer bottle, the failure to disclose plea agreements and the failure to disclose the victim's criminal record with regard to violent offenses.

The record revealed that the forensic report contained the results of a blood test taken of the defendant's blood with defense counsel's knowledge. The test results established that it was the victim's blood and not the defendant's blood found on various samples taken from the crime scene. Upon obtaining the results, the State wrote a letter to defense counsel which contained the results of the forensic

report. It was only the formal C.I.B. report which confirmed what the State had previously disclosed to the defendant that was slid under the defense counsel's door prior to trial. Thus, the trial court correctly found that since the defendant had knowledge of the blood comparison and of the test results, no unfair surprise or prejudice was present.

With regard to the statements of the three men, the record clearly showed that the State immediately disclosed to the defendant the defendant's statements contained within the men's statements. The State voluntarily decided not to use the men's statements because of the late disclosure to the defendant.

Further, the record is replete with evidence from witnesses that the State did not fail to disclose any plea agreements[5] entered into with Goff and Hamrick, as no such agreements existed. *See* Syl.Pt. 2, *State v. James*, 186 W.Va. 173, 411 S.E.2d 692 (1991) (State has duty to disclose any and all inducements given to witnesses in exchange for testimony). As to the alleged failure to disclose the victim's criminal record, the record reflects that the defendant's counsel did not request a copy of the victim's record prior to trial. During trial, a NCIC report was requested and received by the defendant. Apparently there were no crimes of violence listed in North Carolina. Further, the prosecuting attorney stated to the court that she was not aware of any convictions for violent crimes. In addition, since the defendant repeatedly claimed that he was not asserting self-defense, the existence of the victim's criminal record was not relevant. *See* W.Va. R.Evid. 404.

Second, this Court finds no abuse of discretion by the trial court in refusing to grant a mistrial based on comments[6] made by the prosecutor in closing argument. *See State v. Cook*, 175 W.Va. 185, 198–99, 332 S.E.2d 147, 161 (1985). Finally, the trial court, although refusing to give defendant's self-defense instruction, gave a proper self-defense instruction despite the court's belief that such instruction was not warranted by the evidence. *See State v. Bongalis*, 180 W.Va. 584, 588–89, 378 S.E.2d 449, 453–54 (1989).

## INEFFECTIVE ASSISTANCE OF COUNSEL

The last issue raised by the appellant is that he was denied his right to effective assistance of counsel in the representation rendered by the assistant public defender. The appellant maintains that 1) the defense counsel failed to formally raise self-defense or the defendant's mental condition; 2) the defense counsel permitted the prosecutor to lead the State's witnesses; 3) the defense counsel failed to request certain documents in the possession of the State, including a drawing of the crime scene and the deceased's out-of-state criminal record due to the mistaken notion that the record could be introduced through a private investigator who worked for the public defender; 4) the defense counsel failed to request copies of eye-witness statements prior to trial; 5) the defense counsel failed to develop any evidence about the defendant's background to use in a plea for mercy; 6) the defense counsel failed to request an instruction from the court concerning the reason armed guards were in

5. The record indicates that both Goff and Hamrick were charged with and pleaded guilty to accessory after the fact to murder for giving a false statement to the police.

6. According to the appellant, the improper comments made by the prosecutor during closing argument included the following: 1) that Dr. Sopher "can tell us whether or not . . . this was an accident or murder;" 2) a comparison of the defendant's statement that the victim (if he were alive) would say that it was an accident to a

statement of Sirhan Sirhan (the assassin of Robert F. Kennedy, Jr.) before his parole board that "If Bobby Kennedy was alive he would have wanted me paroled;" 3) an argument on the punishment the defendant would receive if he got mercy as opposed to no mercy; 4) a comment to the jury on the defendant's allegation that the State made a deal with Hamrick and Goff and did not report it to the defense. The appellant also argues other alleged misstatements of the evidence and that the prosecutor characterized the defendant as a "killer."

the courtroom throughout the trial;[7] 7) the defense counsel's request of only twenty-five minutes for closing argument when the State had requested fifty minutes. In contrast, the State argues that where there is no evidence upon which defense counsel reasonably could expect to prevail on a claim of self-defense or insanity, the failure to offer such defenses does not constitute ineffective assistance of counsel. Further, the State maintains that none of the other allegations made by the appellant prove by a preponderance of the evidence that his defense counsel was ineffective.

 The standard for determining whether counsel was ineffective is set forth in *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). In syllabus point 19 of *Thomas*, we held that:

> In the determination of a claim that an accused was prejudiced by ineffective assistance of counsel violative of Article III, Section 14 of the West Virginia Constitution and the Sixth Amendment to the United States Constitution, courts should measure and compare the questioned counsel's performance by whether he exhibited the normal and customary degree of skill possessed by attorneys who are reasonably knowledgeable of criminal law, except that proved counsel error which does not affect the outcome of the case, will be regarded as harmless error.

*Id.*, 157 W.Va. at 643, 203 S.E.2d at 449. Further, this Court held that "[w]here a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, un-less no reasonably qualified defense attorney would have so acted in the defense of an accused." *Id.* at Syl.Pt. 21. Finally, the appellant has the burden of proving ineffective assistance of counsel allegations by a preponderance of the evidence. *Id.* at Syl.Pt. 22.

From a review of the record in this case, this Court is unable to find merit in the appellant's claim of ineffective assistance of counsel. However, it is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied. This Court may then have a fully developed record on this issue upon which to more thoroughly review an ineffective assistance of counsel claim.

Consequently, based on the record now before us, we find no ineffective assistance of counsel. This decision, however, is made without prejudice to the defendant to develop a more complete record on this issue in a petition for habeas corpus.

Based on the foregoing opinion, the decision of the Circuit Court of Raleigh County is hereby affirmed.

Affirmed.

---

7. According to the record, two city patrolmen were placed in the back of the courtroom at the defendant's request. The defendant apparently had informed his counsel that threats had been made on his life.