# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 19-0408** (Berkeley County CC-02-2017-F-149)

**Molly Jo Delgado,**
**Defendant Below, Petitioner**

**FILED**
**June 18, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Molly Jo Delgado, by counsel B. Craig Manford, appeals the Circuit Court of Berkeley County's March 28, 2019, order sentencing her to consecutive terms of life incarceration, without mercy, for her two first-degree murder convictions. The State of West Virginia, by counsel Holly M. Flanigan, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On the evening of January 24, 2017, petitioner put her sons, three-year-old D.D. and five-year-old J.D., to bed. Before they fell asleep, petitioner overmedicated her youngest with cough syrup, and then stayed in the boys' shared room until the children fell asleep. After the boys fell asleep, petitioner lit each of their comforters on fire and left the home, locking the front door behind her. As the fires in her children's bedroom grew, petitioner walked across the street to her mother's house to get a can of soup.

Approximately ten minutes after petitioner left the home, her husband Justin Delgado, who had been asleep in the master bedroom, was awakened by smoke filling the home. Mr. Delgado tried to get to his children, but due to the smoke, he was unable to reach their bedroom. Mr. Delgado found his way to the front door of the home, but the door was locked, and he did

not have the key to unlock it.[1] Mr. Delgado then opened a kitchen window and called out for help. By this time, petitioner and her mother, Brenda McCombs, had exited Ms. McCombs's home and were saying their goodbyes. They heard Mr. Delgado calling out and started toward the burning home.

Mr. Delgado was able to exit the home through the window. He raced toward the boys' bedroom window, broke the window, and yelled for his children.[2] Mr. Delgado and petitioner's stepfather Drew McCombs, who had joined the rescue efforts, used a garden hose to spray water into the bedroom. Their efforts proved fruitless. Once firefighters arrived, they pulled Mr. Delgado away from his position outside the boys' bedroom window and, after gaining control of the fire, informed him that his sons had perished.

George Harms, a supervisor in the Investigation Division of the Office of the State Fire Marshal, investigated the fire that took the young boys' lives. Mr. Harms ruled out possible accidental causes of the fire and determined that the fire was incendiary and originated in the boys' bedroom. Petitioner was interviewed during the investigation, and she confessed to setting her children's beds on fire. Accordingly, on May 17, 2017, the grand jury returned a four-count indictment charging petitioner with the first-degree murder of D.D., the first-degree murder of J.D., first-degree arson, and the attempted first-degree murder of Mr. Delgado.[3]

Petitioner and the State entered into plea negotiations, and, on January 31, 2019, an agreement was reached whereby petitioner agreed to plead no contest to the two first-degree murder charges in exchange for the dismissal of the remaining counts. The parties further agreed that the determination of whether mercy should attach to the life sentences imposed for petitioner's first-degree murder convictions would be decided by a jury.[4]

---

[1] Due to the curious nature of petitioner's and Mr. Delgado's sons and the sons' successes in unlocking doors, petitioner and Mr. Delgado installed a lock that required a key to keep their adventurous sons from unlocking the front door and leaving home without permission.

[2] The boys' bedroom window was too small for Mr. Delgado to climb through.

[3] During the pendency of the proceedings below, petitioner was evaluated by two psychologists who recommended that she undergo a comprehensive forensic evaluation to assess her competency to stand trial. Dr. Timothy Thistlethwaite conducted both a competency and criminal responsibility evaluation, and he determined petitioner to be competent to stand trial and criminally responsible. On October 31, 2018, the circuit court entered an order finding petitioner competent to stand trial. The court also noted that there were no objections to the ruling on competency.

[4] West Virginia Code § 62-3-15 provides, in part, that

[i]f the person indicted for murder is found by the jury guilty thereof, and if the jury find in their verdict that he or she is guilty of murder of the first degree, or if

(continued . . .)

On March 5, 2019, the parties appeared for trial on the issue of mercy. Petitioner called various witnesses including her parents and stepfather; decades-long friends; and the two psychologists whose preliminary findings prompted petitioner's competency and criminal responsibility evaluations by psychiatrist Dr. Timothy Thistlethwaite.[5]

Ms. McCombs, petitioner's mother, testified to petitioner's upbringing. She recounted that petitioner was teased during her childhood "because she was a little bit slow and she didn't make friends." Petitioner, who was a respectful and well-behaved child, never got in trouble in school. Ms. McCombs stated that, after graduating high school, petitioner enrolled in a community college, but she was unable to complete even one semester because the coursework proved too challenging. Petitioner's work history was likewise limited, consisting of three places of employment, each for a "[v]ery short" duration. Ms. McCombs saw "nothing inappropriate" in petitioner's parenting of D.D. and J.D., noting that petitioner was "an attentive mother."

Harold Slaughter, a licensed psychologist, testified that he interviewed petitioner while she was incarcerated and found her to be "very depressed. . . . Very flat affect. Very little emotion whatsoever." In reviewing petitioner's medical records from her time in jail, Mr. Slaughter learned that petitioner had reported auditory hallucinations to her psychiatrist and mental health counselor. Mr. Slaughter also testified that petitioner was mildly intellectually impaired. Mr. Slaughter had "concerns" about petitioner's competency; accordingly, he determined that a more comprehensive competency evaluation should be conducted, but he did not render an opinion on that subject.

Petitioner's family members and friends who testified—and who had known petitioner many years and observed her with her children—were in agreement: Petitioner was a good mother whose actions on the night of January 24, 2017, seemed significantly out of character.

The State's witnesses included a few of petitioner's friends; Mr. Delgado; the fire investigator, Mr. Harms; and psychiatrist Dr. Thistlethwaite. One of petitioner's friends, Colleen Clark, recalled that petitioner did not cry at her sons' funeral. Immediately after the funeral, petitioner remarked to Ms. Clark that it would be easier for petitioner and Mr. Delgado to divorce now that Mr. Delgado would not have to pay alimony. But like petitioner's witnesses—

---

a person indicted for murder pleads guilty of murder of the first degree, he or she shall be punished by imprisonment in the penitentiary for life, and he or she . . . shall not be eligible for parole: Provided, That the jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person shall be eligible for parole . . . .

[5] A comprehensive recitation of each witness's testimony from the two-day trial on the issue of mercy is not necessary to resolve petitioner's assignments of error. Accordingly, our recitation here of that testimony is limited to portions of select witnesses' testimony that provide context for petitioner's assignments of error and a broad illustration of the tenor of the trial.

and like other of the State's witnesses who knew petitioner well—Ms. Clark testified that petitioner was a loving mother to her boys.

Mr. Delgado recounted to the jury the horrific events surrounding his sons' deaths. Mr. Delgado testified that, on the night they were murdered, he kissed his boys goodnight before retiring to his bedroom to sleep after a day of physically demanding work. He woke up, unable to see anything, "choking on the smoke." He testified that after he yelled to petitioner from the window before making it out of his burning home, petitioner started toward the house but "wasn't in a hurry."

Mr. Delgado described his frantic efforts to save his boys and explained that

the smoke was just so—so thick and you couldn't see nothing. And like I said I kept calling their names. You know, just praying to Jesus that they were safe. Like I said I got scars on my fingers where I was trying to get through the window and break the glass and, you know, just reach in there and see if I could, you know, just to get them.

When Mr. Delgado was treated at the hospital later that evening, he recalled that petitioner was "[n]ot really worried at all. At the time she was calmer than me. All I did was cry." At the boys' funeral, Mr. Delgado said that he "stayed in tears and I cried and I remember people coming and, you know, just telling me how sorry they were." Petitioner, on the other hand, "worked the room, you know, she walked around and joked and laughed and smiled and, you know, I never seen a tear period."

Cathy Butler, another friend of petitioner's, testified that petitioner "was very protective of her children. I can't say anything bad about [petitioner] as far as not being a good mother as far as her children." On one occasion, however, petitioner disclosed to Ms. Butler that she had had dreams about hurting or killing her children. When Ms. Butler spoke to petitioner's stepfather about this statement, petitioner's stepfather acknowledged that petitioner had made similar comments to him. Ms. Butler testified that, although she saw petitioner on several occasions after her boys died, she never saw petitioner cry or state that she missed them. Petitioner did say that she missed her dog, though, who was unable to accompany petitioner and Mr. Delgado to the apartment into which they moved after the fire.

Mr. Harms detailed that when he arrived at the scene of the fire on the evening of January 24, 2017, one of the children had been recovered during the initial search of the home. That child, D.D., was recovered from his bed and pronounced dead at the scene. After ventilating the home, firefighters conducted a secondary search and found J.D.'s body in the corner of his bedroom near an air vent. Working with the medical examiner, Mr. Harms learned that D.D. died as a result of "inhalation of product combustion with contributory thermal burns," and an "[a]dditional contributory condition[] include[d] dextromethorphan intoxication caused by over medication by [petitioner]." J.D. did not have cough medicine in his system; consequently, J.D.'s death occurred solely as a result of the fire. Both deaths were deemed homicides.

4

Mr. Harms was present for petitioner's interviews with law enforcement; accordingly, he was present for her admission to starting separate fires on her sons' beds while they slept. Mr. Harms stated that testing confirmed that two separate fires were started; one bed fire did not transfer to the second bed.[6]

Finally, Dr. Thistlethwaite testified that petitioner had impaired intellectual functioning, and in conducting his competency evaluation, he noted that petitioner "might need perhaps a little extra time for explanation of concepts." But he saw "no reason to suspect that she couldn't participate in the trial process" and found her competent to stand trial. With respect to criminal responsibility, Dr. Thistlethwaite opined that petitioner knew right from wrong—and knew specifically that setting the fires was wrong—and he found no evidence of any psychiatric illness or difficulty that would have caused petitioner not to be able to conform her behavior to the requirements of the law or society's norms. In other words, Dr. Thistlethwaite found petitioner to be criminally responsible. Dr. Thistlethwaite also testified that he documented no emotional reaction from petitioner regarding the death of her children, and he did not see any signs of regret or remorse from her.

Following the presentation of evidence, closing arguments, and the jury's deliberations, the jury returned a verdict recommending that no mercy attach to either of petitioner's first-degree murder convictions. The court proceeded to sentence petitioner to consecutive terms of life imprisonment for each conviction, reasoning that

> [t]he [c]ourt has taken note during the course of the trial that it's clear to this [c]ourt that there were two separate crimes committed even though they were crimes committed by the same mechanism that being fire they were crimes that were initiated separately, distinctly, and purposely. According to the all the evidence which is un-contradicted in the trial of the matter the comforters of the two young boys were separately set fire to at different times.
>
> In addition, the youngest child appears by all evidence without any refutation to have been sedated. So there appears to have been clear intent to do something different with regard to one of the victims than with regard to the other. And due to the heinousness of the crime the [c]ourt will run these sentences consecutive to one another.

The court entered its conviction and sentencing order on March 28, 2019, memorializing petitioner's convictions and sentences. This appeal followed.

---

[6] Mr. Harms also testified to other issues learned during the investigation into the fire and the boys' deaths, including that petitioner was in an ongoing sexual relationship with another couple. Indeed, petitioner committed adultery throughout her marriage to Mr. Delgado, but he remained committed to her and their family, taking her back each time. Petitioner's cell phone records revealed that, on the night she murdered her boys, she spent the hour immediately preceding the start of the fires on the phone with her then-current male lover.

In the first of her two assignments of error on appeal, petitioner argues that the jury's recommendation of no mercy was against the weight of the evidence. Petitioner argues that "clearly the jury could not get past the shock of the intentional killing of a five and a three year [sic] child," causing the jury to ignore the mitigating evidence presented on her behalf. The mitigating evidence included that petitioner was bullied as a child; had impaired intellectual functioning; had some mental issues; and, at least before she murdered her children, was a good and loving mother who no one suspected would harm her children. Petitioner contends that the finding of no mercy was "the product of bias for the State[,] prejudice against the [p]etitioner[,] and sympathy for the victims," which amounts to a denial of mercy "upon impermissible factors."

We have held that "[t]he recommendation of mercy in a first degree murder case lies solely in the discretion of the jury." Syl. Pt. 7, in part, *State v. Triplett*, 187 W. Va. 760, 421 S.E.2d 511 (1992). And a jury considering the issue of mercy should have "the unfettered discretion of making the determination of mercy based solely on their impression of the defendant and the circumstances of the case." *State v. Miller*, 178 W. Va. 618, 622, 363 S.E.2d 504, 508 (1987). Petitioner has failed to demonstrate that the jury here considered anything other than factors that were within its discretion to consider and weigh. Petitioner claims that "the jury could not get past the shock of the intentional killing of" her young sons; yet, in considering mercy, the jury is given unfettered discretion to consider the circumstances of a case, which circumstances here included petitioner's shockingly heinous acts. *See id.* Petitioner's claims that the jury disregarded mitigating circumstances or was swayed by bias or sympathy are likewise meritless because the claims are conclusory and unsupported. Furthermore, the jurors were instructed that they "must not permit yourself to be influenced by sympathy, passion, prejudice, or public sentiment for or against the defendant or for or against the [S]tate." Petitioner's unsupported assertions are insufficient to warrant a finding that the jury disregarded this instruction. Accordingly, petitioner is entitled to no relief in this regard.

In petitioner's second assignment of error, she argues that the circuit court's imposition of consecutive sentences shocks the conscience and is, therefore, an unconstitutionally disproportionate sentence. Although petitioner acknowledges that the argument is "academic," she nevertheless claims that concurrent sentences would not shock the conscience.

"The Supreme Court of Appeals reviews sentencing orders, including orders of restitution made in connection with a defendant's sentencing, under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Syl. Pt. 1, *State v. Lucas*, 201 W. Va. 271, 496 S.E.2d 221 (1997). With respect to the constitutional issues raised by petitioner, "[t]here are two tests to determine whether a sentence is so disproportionate to a crime that it violates our constitution." *State v. Cooper*, 172 W. Va. 266, 272, 304 S.E.2d 851, 857 (1983). Petitioner's argument implicates only the first test, however. This first test "is subjective and asks whether the sentence for the particular crime shocks the conscience of the court and society." *Id.*

Petitioner bases her claim of an unconstitutionally disproportionate sentence solely on the circuit court's imposition of consecutive rather than concurrent sentences. Under West Virginia Code § 61-11-21, however, consecutive sentences are the norm rather than the exception:

6

> When any person is convicted of two or more offenses, before sentence is pronounced for either, the confinement to which he may be sentenced upon the second, or any subsequent conviction, shall commence at the termination of the previous term or terms of confinement, unless, in the discretion of the trial court, the second or any subsequent conviction is ordered by the court to run concurrently with the first term of imprisonment imposed.

The intent that simultaneously imposed sentences run consecutively is also borne out in syllabus point 3 of *Keith v. Leverette*, 163 W. Va. 98, 254 S.E.2d 700 (1979): "When a defendant has been convicted of two separate crimes, before sentence is pronounced for either, the trial court may, in its discretion, provide that the sentences run concurrently, and unless it does so provide, the sentences will run consecutively." Here, the circuit court explained that consecutive sentences were appropriate in light of the fact that petitioner "separately, distinctly, and purposely" started two fires, one to each child's bed. The court also took note of the fact that petitioner administered a sedative to her youngest son, which evidenced a "clear intent to do something different with regard to" him. Under these facts, we find no abuse of the court's discretion in imposing consecutive sentences, nor do petitioner's sentences shock the conscience. Therefore, petitioner's sentences are not disproportionate to her crimes.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 18, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison