# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia**
**Petitioner Below, Respondent**

**vs.)  No. 21-0523** (Mingo County No. J21-F45)

**Michael Vance,**
**Respondent Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Michael Vance, by counsel Mark Hobbs, appeals the June 2, 2021, order of the Circuit Court of Mingo County that sentenced him for his conviction by a jury of (1) wanton endangerment in violation of West Virginia Code § 61-7-12 to an indefinite term of not less than one nor more than five years in prison; and (2) cruelty to animals in violation of West Virginia Code § 61-8-19(b) to an indefinite term of not less than one nor more than five years in prison. Respondent State of West Virginia, by counsel Patrick Morrisey and Andrea Nease Proper, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error with regard to petitioner's first and third assignments of error. For these reasons, a memorandum decision affirming the order of the circuit court regarding those two assignments of error is appropriate under Rule 21(c) of the Rules of Appellate Procedure. However, regarding petitioner's second assignment of error, petitioner and the State of West Virginia agree that the circuit court erred in imposing an improper sentence upon petitioner. Thus, as we discuss below, under Rule 21(d) of the Rules of Appellate Procedure, we reverse and remand this case to the circuit court with instructions to impose a proper sentence.

This case arises from petitioner Michael Vance's June 3, 2020, shooting and killing of a pit bulldog named "Diesel" who was owned by petitioner's neighbor, Larry "Bo" Jones. At the time of the shooting, petitioner and his dog, "Patches," who is also a pit bull, were in close proximity to Diesel and Mr. Jones, and the two dogs were fighting.

Thereafter, a Mingo County grand jury indicted petitioner during the January 2021 term of court on two counts: Count I alleged that petitioner "did unlawfully, knowingly, intentionally, wantonly and feloniously perform an act with a firearm that created a substantial risk of death or

1

serious bodily injury to [Mr.] Jones . . . in violation of West Virginia Code § 61-7-12." Count II alleged that petitioner "did unlawfully, knowingly, intentionally cruelly mistreat an animal, to-wit: a dog by shooting and wounding said dog . . . in violation of West Virginia Code § 61-8-19(b)."

At petitioner's April 5, 2021, trial, Deputy Joshua Tincher of the Delbarton Police Department testified as follows: First, he obtained surveillance videos of petitioner's shooting of Diesel. One video showed that at the time of the shooting, Patches was on a leash but that petitioner did not use the leash to control Patches. The video also shows that Mr. Jones let Diesel out of the door of the apartment where he lived and that the two "dogs start[ed] to go at each other a little bit playing around and you hear [petitioner] saying "Git him, Patches. Git him, Patches . . . that's when [petitioner] fires the gun and shoots Diesel, who later died[.]" Second, petitioner told the deputy prior to Diesel's death that he was going to kill Diesel. Third, on the day of the shooting, there was a report that Diesel "laid down a dirt bike and its rider, [Hayden Malin]." A video was played of that incident at trial that showed Diesel was wagging his tail at the time he encountered the dirt biker. Fourth, during the deputy's investigation of the shooting, Glen Dale Canada, a local store owner, signed a statement claiming that the day before the shooting petitioner said he was going to kill Diesel. Fifth, the deputy spoke with a "Mr. Hunt" who reported seeing petitioner shoot the dog and that Mr. Jones was "standing right there." The second video obtained by Deputy Tincher was then played, which showed Patches attacking Diesel although it did not show petitioner shooting Diesel. Petitioner's counsel lodged no hearsay objections during the deputy's testimony.

Mr. Jones, Diesel's owner, testified that he lived in the same apartment building as did petitioner and that his apartment was directly below petitioner's apartment. Mr. Jones said Diesel was outside with him just before the incident with Patches and that he did not know that Patches was nearby until the incident occurred. Mr. Jones said that on the day in question, he and Diesel had been outside and, as he opened his apartment building door to let Diesel back into his apartment, he saw petitioner and Patches approach. Mr. Jones said that petitioner called him a name and then dropped Patches' leash. He said that Diesel got loose and "went on" Patches and "started beating him up." Mr. Jones stated that, at that point, petitioner shot Diesel in the back and that Diesel died soon thereafter. Finally, Mr. Jones further testified that he was "close to" Diesel when petitioner shot Patches.

Hayden Malin, the dirt bike rider mentioned above, testified that Diesel approached him while he was on his dirt bike and startled him. He described Diesel as "[v]ery playful," said that Diesel's tail was wagging, and that Diesel did not attempt to knock him off his dirt bike.

Glen Dale Canada testified regarding a statement he signed and gave to Deputy Tincher. The signed statement provided the following:

> [Petitioner] said on June 2nd . . . he was going to kill [Diesel] on June 3rd and then on June 3rd [petitioner] walked his dog up to [Diesel] and when the dog[s] got into it [petitioner] shot [Diesel] with the pistol he was carrying. This happened right behind my store.

2

The statement was then entered into evidence. On cross-examination, Mr. Canada stated that petitioner did not say on which date he planned to kill Diesel and that someone else wrote out the statement he signed. Mr. Canada clarified that petitioner came into his store and said, "I'm going to kill that dog" and that petitioner identified Diesel as the dog he intended to kill.

Charles Albert Hunt testified that he lived near petitioner and Mr. Jones and that he knew Diesel. He said that on the day petitioner shot Diesel, he saw Diesel and Patches lick each other and then start to fight. He said the dogs broke apart momentarily and then began to fight again. Mr. Hunt said that, at that point, petitioner shot Diesel. Mr. Hunt further testified that, at one point, Mr. Jones was standing about ten or fifteen feet from where the dogs were fighting and, when petitioner shot Diesel, Mr. Jones was close enough to have reached down and grabbed Diesel. Mr. Hunt described Diesel as a gentle dog who was bigger than Patches.

Thereafter, the State rested and petitioner moved for a directed verdict on the wanton endangerment count claiming that Mr. Jones was not close enough to Diesel to be in any danger from the gun shot that killed Diesel. The circuit court denied petitioner's motion.

Petitioner called two witnesses during his case-in-chief. His first witness was his daughter, Michelle Vance. Ms. Vance testified that she lived in the same apartment building as did petitioner but in a different apartment. She said that Diesel was bigger than Patches and that the dogs had always been kept apart because it was unknown how they would react to each other. Ms. Vance said that when she saw Diesel lunge at Patches, she ran to help her father and then heard the gun shot. She said she asked petitioner where the shot came from and that petitioner replied, "I had to do it." Ms. Vance said she got Patches leashed and then went back to check on petitioner. Ms. Vance opined that the dogs fought for "a couple of minutes" and that her father pulled on Patches' chain, but Patches pulled him across the road. Ms. Vance also said that, prior to the dog fight, petitioner and Mr. Jones were arguing and that Mr. Jones "cussed" at petitioner and the petitioner "cussed back." She stated that, in response, Mr. Jones opened his door and said, "Get 'em Diesel" and that the dog complied and ran straight to petitioner and Patches. Ms. Vance also estimated that Mr. Jones was about fifteen feet away from Diesel when petitioner shot Diesel. She then testified to an instance in which she alleged Diesel bit someone in the ankle and to a second instance in which Diesel allegedly jumped on a dirt bike rider and tried to bite him.

Petitioner testified next. He admitted that he and Mr. Jones were not friends and that on the day in question he "cussed [Mr. Jones] out" for breaking into his conversation with another person. Petitioner said that Mr. Jones then called to Diesel and that Diesel and Patches "postured up beside of each other," but that "Patches made no attempt to go to him or anything." He said the dogs then fought for about "maybe 30, 30 seconds, at least." He said he tried to pull Patches away from Diesel, but that Diesel had hold of Patches and he could not pull the dogs apart. Petitioner said Mr. Jones just watched. Petitioner further testified that he did not want to kill Diesel and did not intend to kill him when he left his house with Patches. Petitioner denied telling Mr. Canada that he was going to shoot Diesel. Petitioner said that, instead, he told Mr. Canada that "I wish some of his friends, one of [Mr. Jones's] friends would get him to ease up because he was going to get his dog shot, because he'd threatened me so many times with him." Thereafter, petitioner again moved for a judgment of acquittal on both charges. The court denied that motion.

The jury deliberated for an hour and fifteen minutes and then indicated they were hung on Count Two (cruelty to animals) but had a unanimous verdict on Count One (wanton endangerment). The court read the jury an *Allen* charge and asked them to deliberate for another hour on Count Two. The jury then retired to the jury room and, thereafter, returned with a verdict finding petitioner guilty of both counts of the indictment.

Petitioner's conviction order was entered April 19, 2021. On April 30, 2021, petitioner moved for a judgment of acquittal on Count Two (cruelty to animals). Petitioner argued that he was indicted on a misdemeanor but was erroneously convicted of a felony. The court denied that motion by order entered June 2, 2021.

At petitioner's May 18, 2021, sentencing hearing, petitioner sought probation claiming serious health problems and advanced age. The State sought consecutive terms. By order entered June 2, 2021, the circuit court sentenced petitioner for his conviction for wanton endangerment in violation of West Virginia Code § 61-7-12 to an indefinite term of not less than one nor more than five years in prison; and for cruelty to animals in violation of West Virginia Code § 61-8-19(b) to an indefinite term of not less than one nor more than five years in prison. The court ordered that the sentences be served consecutively. Petitioner now appeals and raises three assignments of error.

In his first assignment of error, petitioner argues that the circuit court abused its discretion by permitting Deputy Tincher to testify regarding what witnesses and others told him where that testimony did not fall under any hearsay exception. Specifically, petitioner cites to Deputy Tincher's testimony regarding the following three persons: (1) "[Mr. Canada] told me that [petitioner] had come in [to Mr. Canada's store] the day before [the shooting] and stated that he was going to kill [Mr. Jones'] dog[]." (2) Mr. Hunt said, "he seen [petitioner] shoot the dog" and agreed that Mr. Jones was close to the shooting which presented "a danger" due to the possibility of "ricochets," "debris," and "injuries that could disfigure you or maim you or actually kill you." (3) "Nichole," the dirt bike rider's girlfriend, said "she heard something that sounded like a gunshot but didn't see it[.]" Petitioner admits that his counsel did not object to this testimony at trial. Therefore, we review this assignment of error for plain error.

"The plain-error doctrine . . . authorizes [an appellate court] to correct only 'particularly egregious errors,' . . . that 'seriously affect the fairness, integrity or public reputation of judicial proceedings[.]'" *United States v. Young*, 470 U.S. 1, 15, 105 S. Ct. 1038, 1046, 84 L. Ed. 2d 1 (1985). "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). Plain error warrants reversal "solely in those circumstances in which a miscarriage of justice would otherwise result." *Id.* at 18, 459 S.E.2d at 129 (citing *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)).

Petitioner "bears the burden of persuasion on each of the four prongs of the plain error standard." *Lowery v. United States*, 3 A.3d 1169, 1173 (D.C. 2010). "Satisfying all four prongs of the plain-error test is difficult[.]" *United States v. Williamson*, 706 F.3d 405, 413 (4th Cir. 2013). "[S]uch error is rarely found." 9 James Wm. Moore et al., *Moore's Federal Practice* ¶ 46.02[2]

4

(3rd ed. 2002). "Historically, the 'plain error' doctrine 'authorizes [an appellate court] to correct only particularly egregious errors' . . . that 'seriously affect the fairness, integrity or public reputation of judicial proceedings[.]" *Miller*, 194 W. Va. at 18, 459 S.E.2d at 129 (citing *United States v. Young*, 470 U.S. 1, 15 (1985)). "Plain error warrants reversal 'solely in those circumstances in which a miscarriage of justice would otherwise result.' *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816, 827 n. 14 (1982)." *Id.*

> Assuming that an error is "plain," the inquiry must proceed to its last step and a determination made as to whether it affects the substantial rights of the defendant. To affect substantial rights means the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court, and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice.

*Id.*, Syl. Pt. 9.

Petitioner fails to meet this burden of persuasion. First, Mr. Canada, Mr. Malin, and Mr. Hunt all testified on direct examination and were cross-examined by petitioner's trial counsel. When a declarant of a hearsay statement appears for cross-examination at trial, there is no violation of the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004); *California v. Green*, 399 U.S. 149, 162 (1970). Further, "[t]he Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9.

As for "Nichole," although she did not testify at petitioner's trial, she was mentioned twice by Deputy Tinchner. On direct, the deputy said that he spoke with Nichole and learned that she was Mr. Malin's girlfriend and that she heard a gunshot but did not see anything. On cross-examination, the deputy said that "all [Nichole] heard was the shot." Even if we presume this testimony is hearsay, it does not rise to the level of plain error because "[a]n error in admitting hearsay evidence is harmless where the same fact is proved by an eyewitness or other evidence clearly establishes the defendant's guilt." Syl. Pt. 4, *State v. Helmick*, 201 W. Va. 163, 495 S.E.2d 262 (1997). Moreover, Nichole's statement to Deputy Tincher regarded the identity of her boyfriend, Mr. Malin. That statement was not used to prove any fact in dispute. Thus, Deputy Tincher's testimony regarding Nichole did not violate Rule 801(c)(2) of the West Virginia Rules of Evidence, which provides that "'Hearsay' means a statement that . . . (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Thus, petitioner fails to show that the deputy's brief testimony regarding Nichole satisfied the final two prongs of the plain error test, i.e., that the deputy's brief testimony regarding Nicole's alleged statements affected petitioner's substantial rights or seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Accordingly, we find no error.

In petitioner's second assignment of error he argues that the circuit court erred by sentencing him to an indefinite term of incarceration for his conviction of wanton endangerment with a firearm because the relevant statute, West Virginia Code § 61-7-12, required the circuit court to impose a definite term of incarceration. In support, petitioner highlights that the State concedes that he was improperly sentenced to an indeterminate sentence.

"[We] review[] sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Syl. Pt. 1, *State v. Lucas*, 201 W. Va. 271, 496 S.E.2d 221 (1997).

West Virginia Code § 61-7-12 provides:

Any person who wantonly performs any act with a firearm which creates a substantial risk of death or serious bodily injury to another shall be guilty of a felony, and, upon conviction thereof, shall be confined in the penitentiary for a *definite term of years* of not less than one year nor more than five years, or, in the discretion of the court, confined in the county jail for not more than one year, or fined not less than two hundred fifty dollars nor more than two thousand five hundred dollars, or both.

In light of this clear language, we concur that the circuit court erroneously sentenced petitioner for his conviction for wanton endangerment with a firearm to an indeterminate sentence. West Virginia Code § 61-7-12 clearly requires a determinate sentence of between one and five years for a conviction under that section. A criminal sentence "must conform strictly to the statute which prescribes the punishment to be imposed and . . . any variation from its provisions, either in the character or the extent of the punishment inflicted, renders the judgment absolutely void." Syl. Pt. 1, in part, *State ex rel. Boner v. Boles*, 148 W. Va. 802, 137 S.E.2d 418 (1964) (citing Syl. Pt. 3, *State ex rel. Nicholson v. Boles*, 148 W. Va. 229, 134 S.E.2d 576 (1964)), *overruled on other grounds by State v. Eden*, 163 W. Va. 370, 256 S.E.2d 868 (1979).

"When a sentence imposed in a criminal case is void, either because of lack of jurisdiction or because it was not warranted by statute for the particular offense, the court may set aside such void sentence and pronounce a valid sentence even though the execution of the void sentence has commenced, and without regard to the time when, or the term within which, such void sentence was imposed." Syllabus point 6, *State ex rel. Boner v. Boles*, 148 W.Va. 802, 137 S.E.2d 418 (1964), *overruled on other grounds by State v. Eden*, 163 W.Va. 370, 256 S.E.2d 868 (1979).

Syl. Pt. 5, *State v. Cottrill*, 204 W. Va. 77, 511 S.E.2d 488 (1998). The proper action in such cases is remand for a correction of sentence: "the lower court's imposition of an indefinite term [when the law requires a definite term] merited reversal only for the purpose of having the judgment of sentence corrected." *State v. Lawson*, 165 W. Va. 119, 123, 267 S.E.2d 438, 440 (1980); *see also State v. Williams*, 172 W. Va. 295, 312, 305 S.E.2d 251, 268 (1983) (affirming a conviction but reversing the sentencing order and remanding for resentencing). Therefore, we remand this case to the circuit court with instructions that petitioner be resentenced for his conviction for wanton endangerment with a firearm commensurate with the sentence permitted by West Virginia Code § 61-7-12.

In petitioner's third and final argument, he claims that his trial counsel "appears to have been ineffective" as counsel offered no jury instructions and, apparently, made no objections during the evidence phase of trial.

In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

*Miller*, 194 W. Va. at 6-7, 459 S.E.2d 117-18, Syl. Pt. 6.

"In past cases, th[e] Court has cautioned that '[i]neffective assistance claims raised on direct appeal are presumptively subject to dismissal.'" *State v. Woodson*, 222 W. Va. 607, 621, 671 S.E.2d 438, 452 (2008) (quoting *State v. Miller*, 197 W. Va. 588, 611, 476 S.E.2d 535, 558 (1996)); *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 317 n.1, 465 S.E.2d 416, 419 n.1 (1995) ("Traditionally, ineffective assistance of counsel claims are not cognizable on direct appeal."); *see also State v. Martin R.*, No. 15-0580, 2016 WL 1456077, at *3 (W. Va. April 12, 2016)(memorandum decision) (same). Indeed, the Court has held that

[i]t is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied. This Court may then have a fully developed record on this issue upon which to more thoroughly review an ineffective assistance of counsel claim.

Syl. Pt. 10, *State v. Triplett*, 187 W. Va. 760, 421 S.E.2d 511 (1992).

The very nature of an ineffective assistance of counsel claim demonstrates the inappropriateness of review on direct appeal. To the extent that a defendant relies on strategic and judgment calls of his or her trial counsel to prove an ineffective assistance claim, the defendant is at a decided disadvantage. Lacking an adequate record, an appellate court simply is unable to determine the egregiousness of many of the claimed deficiencies. Such a situation exists here.

*Miller*, 194 W. Va. at 15, 459 S.E.2d at 126. Here, petitioner's claims of ineffective assistance of counsel implicate trial counsel's strategic decisions and judgment calls regarding objections and jury instructions. Therefore, we decline to address petitioner's ineffective assistance of counsel claim on direct appeal.

Accordingly, for the foregoing reasons, we affirm, in part, and reverse, in part, the circuit court's June 2, 2021, sentencing order and remand the case with instructions that petitioner be resentenced for his conviction of wanton endangerment with a firearm to a definite term of incarceration as required by West Virginia Code § 61-7-12.

Affirmed, in part, reversed, in part, and remanded.

**ISSUED:** May 26, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton

**NOT PARTICIPATING:**

Justice C. Haley Bunn

8